UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
CHRISTOPHER CONLEY,

                  Petitioner,                  **OPINION & ORDER**
                                                                     05-CV-5810 (SJF)

        -against-

ROBERT J. EBERT, SUPERINTENDENT of the
OTISVILLE CORRECTIONAL FACILITY,

                  Respondent.
----------------------------------------X

FEUERSTEIN, J.

I.    Introduction

       On February 21, 2001, *pro se* petitioner Christopher Conley ("Petitioner" or "Conley") was convicted by a jury in the County Court of the State of New York, Suffolk County, of arson in the third degree and criminal mischief in the in the second degree. He now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the petition is denied.

II.   Petitioner's Pleadings

       A *pro se* plaintiff's submissions are held "to less stringent standards than formal pleadings drafted by lawyers . . . ." Hughes v. Rowe, 449 U.S. 5, 9 (1980) (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972)). To this end, a court must "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'" McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). Nonetheless, a *pro se* plaintiff is not exempt from compliance with

1

relevant rules of procedural and substantive law. <u>Faretta v. California</u>, 422 U.S. 806, 834 n. 36 (1975)

III. Background

    A.    Factual Background[1]

In February 2000, Conley was hired as a bartender at Broadway's Pub ("the bar") in Amityville, New York. Tr. 656.[2] The bar was owned by Susan Munson ("Munson") and her brother Nick DeMaria ("DeMaria"). Conley was a trusted employee and had keys to the bar. Tr. 328, 654, 657-658. On March 1, 2000, Conley was not working but went to the bar to drink and met former professional figure skater Patti Johnson ("Johnson"). Tr. 245-46, 660, 664. In the early morning hours of March 2, 2000, Conley asked DeMaria if he could leave his car in the rear parking lot and if DeMaria could call a taxicab for him and Johnson. Tr. 665. Before Conley and Johnson left, DeMaria asked Conley for his keys to the bar. Conley told DeMaria that he had left them at home; Conley and Johnson then left. Tr. 249, 504, 665-667.

At approximately 3:00 A.M., Johnson and Conley arrived at Johnson's home and Johnson invited Conley inside. Tr. 249. Once inside, an intoxicated Conley made sexual advances toward Johnson only to be rebuffed and asked to leave. Tr. 250, 255. Johnson insisted that Conley take a taxicab home, calling one for him; Conley however, wanted to take a taxicab to Broadway's Pub to retrieve his car. Tr. 250. Johnson went to sleep and Conley went outside to wait for the taxicab. Tr. 251.

Later that same morning, Officer Brian Smith ("Smith") observed Conley's car make an illegal right turn. Tr. 90-93. Smith followed the car, which then proceeded to cross a divider

---
[1] These facts are taken from the underlying petition and the trial transcripts.
[2] "Tr." refers to pages in the trial transcript.

2

and head into oncoming traffic. Smith pulled over the vehicle. Tr. 93-94. He detected the odor of alcohol on Conley's breath, and spotted what appeared to be a liquor bottle on the floor of his car. He asked Conley to step out of the car to perform a series of field sobriety tests. Tr. 96-97. Noting Conley's poor performance on the tests, Smith placed Conley under arrest for driving while intoxicated and transported him to the Amityville Police Station. Smith and Conley arrived at the sation house at approximately 5:18 A.M. Tr. 107. At the station house Smith looked out the window and commented on a fire he could see off in the distance and that the air was filled with smoke. Tr. 110. In response, Conley, stated, "I hope that's not Broadway's Bar." Tr. 111. Moments later, Conley turned to Smith and asked, "Do you have any demons? I do." Tr. 112.

At approximately 5:28 A.M., Officers Glen Slack ("Slack") and Colin Mullen observed smoke bellowing out of the front roof section of Broadway's Pub and a flame above the rear entrance. Tr. 49-53. Slack checked the exterior of the building and found no evidence of breaks or other signs of forced entry. Id. Shortly thereafter, members of the Amityville Volunteer Fire Department arrived on the scene and forced the front door of the bar open. Tr. 78. Confronted by heavy smoke and heat, the crew immediately began dousing the flames. Tr. 80-81. When the smoke cleared, the crew advanced further into the building. At one point the fire advanced past them and the firefighters pulled out, opting instead for an exterior attack. Tr. 81-83. Nearly eighty (80) firemen fought the blaze for over four (4) hours before it was fully extinguished.

At approximately 7:40 A.M., Detective Mike Paul ("Paul") from the Suffolk County Arson Squad arrived at the scene of the fire. After the fire was extinguished, Paul investigated the area. Paul determined that the fire had two (2) points of origin: the bar itself which burned

3

away the support beams and roof above, Tr. 419-420, 425, and the office on the right side of the desk. Tr. 443, 450. Munson and DeMaria indicated to Paul that approximately three to four hundred dollars ($300-$400) was kept in a steel cashbox in the office and two (2) sealed bottles of Absolut vodka were on the desk. Paul recovered only an empty cash box. Tr. 447-457.

Detective Charles McDermott ("McDermott") of the Suffolk County Police Arson Squad spoke with a member of the Amityville Police Department at the scene of the fire and learned that an employee of Broadway's Pub had been arrested earlier that morning. Tr. 540-41. McDermott proceeded to the Amityville Police Headquarters with Detective Pat Estelle ("Estelle") where they met with Conley. Tr. 542-3. They advised Conley that he was not a suspect but that they wanted to know his whereabouts of the night before and get an explanation for the two (2) bottles of liquor found in his car. Tr. 544. Conley responded that he thought he might need an attorney, but did not request one. Tr. 544, 130. After nearly forty (40) minutes, the interview concluded and the detectives left to photograph and impound Conley's car.

Paul went to the impound yard to take further photographs and to document the car's contents. Tr. 554-560. On the floor of Conley's car were two (2) sealed bottles of Absolut vodka and on the dashboard was a Styrofoam cup containing a rolled up wad of money in the amount of three hundred and thirty-six dollars ($336). Tr. 562-575.

On March 3, 2000, DeMaria was home when his pager signaled calls from Conley, who had been released from custody on bail. DeMaria telephoned Conley who told him that he had done something terrible and wanted to make things right for burning the bar. Tr. 447-478, 675-676. They spoke briefly about possible solutions and the cost of rebuilding the bar. Conley and

DeMaria made arrangements to speak again later that evening. Tr. 676-677. DeMaria then had Munson call Paul. Tr. 479.

Also on March 3, Conley spoke to his ex-girlfriend Lisa Lokatz ("Lokatz"). Conley told her that he had spoken with DeMaria about setting fire to the bar and that DeMaria would not press charges if Conley came up with enough money. Conley further explained to Lokatz how he had taken money from the cash box in the office and two (2) bottles of vodka. He told her he needed to call his family for money. Tr. 290. Lokatz agreed to help Conley and drove him to a nearby shopping center to use a payphone.

At approximately 6:00 P.M., on March 3, members of the Suffolk County Arson Squad placed a suction-cup microphone on the receiver of DeMaria's phone and hooked it up to a cassette recorder. Tr. 626. At 8:00 P.M., then again at 9:00 P.M., DeMaria was paged by Conley. They spoke several times and each conversation was recorded. Tr. 627-630, 677. After the last conversation, the detectives were able to identify the phone Conley was using and thereafter responded to that location. Tr. 732-733, 785. Conley was identified and immediately arrested. Tr. 291-293, 786-787.

Upon arrival at the First Precinct, Conley was visibly upset and crying. Tr. 735-737, 788. Conley was taken to an interview room and advised of his rights. Tr. 789. Conley acknowledged that he understood his rights and agreed to speak with detectives without an attorney. Tr. 793-94.

Conley told Paul that at approximately 10:00 P.M. on March 1, 2000, he had gone to Broadway's Pub. He saw some friends and agreed to stay and drink. Tr. 795, 808. Around 2:30 A.M., on March 2, he left the bar with Johnson in a taxicab. His car remained parked in the rear

parking lot. Tr. 795, 808. After being rebuffed by Johnson, Conley returned to the bar and entered through the front door using his key. Conley determined that the building was empty and proceed to drink some rum.

Conley recalled taking money from the cash box and two (2) bottles of Absolut vodka before returning to the bar area. Tr. 798, 809. Conley placed the two (2) bottles of vodka on the rear of the bar, poured rum on the top of the bar and lit it with a match. After igniting the rum, Conley left through the back door with the bottles of vodka and the money from the cash box. Tr. 799, 809. He entered his car and drove away. Conley remembered being pulled over by a police officer a short while later. Tr. 810.

B. Procedural History

On February 21, 2001, Petitioner was convicted of arson in the third degree and criminal mischief in the in the second degree. On March 26, 2001, Petitioner moved to set aside the jury's verdict pursuant to New York Criminal Procedure Law ("N.Y.C.P.L.") §330.30. On May 16, 2001, the County Court of the State of New York, Suffolk County denied Petitioner's motion. See People v. Conley, Ind. No. 00583-2000 (May 16, 2001). On May 30, 2001, Petitioner was adjudicated a predicate felon and sentenced to a period of incarceration of seven and one-half (7½) to fifteen (15) years for the arson conviction and three (3) to six (6) years for the criminal mischief conviction. The sentences run concurrently with each other. Petitioner appealed his conviction to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department. Petitioner claimed: 1) deprivation of the right to present a defense because the trial court refused to admit psychiatric evidence on the issue of Petitioner's alleged blackout; 2) a harsh and excessive sentence; 3) failure to prove guilt beyond a reasonable doubt;

and 4) failure to allow Petitioner time to obtain a transcript of an out of state conviction. On February 5, 2004, Petitioner was granted leave to file a *pro se* supplemental brief. In that brief, Petitioner claimed ineffective assistance of counsel in that counsel: 1) failed to timely seek expert testimony; 2) failed to raise an intoxication defense; 3) made an untimely motion to suppress; 4) failed to seek a probable cause hearing; and 5) failed to secure a fair and impartial jury. On October 25, 2004, the Second Department affirmed Petitioner's conviction and held: 1) the trial court correctly denied the application to present psychiatric testimony regarding alcoholic blackouts as untimely; 2) the sentence was not excessive; 3) the jury rejected the intoxication defense and that other issues regarding insufficiency of proof were not preserved for appellate review; 4) the verdict was not against the weight of the evidence; and 5) Petitioner's remaining claims, including his ineffective assistance of counsel claims, were without merit. See People v. Conley, 783 N.Y.S.2d 83 (App. Div. 2d Dep't. 2004). Petitioner then sought leave to appeal to the New York Court of Appeals which was denied on December 4, 2004. See People v. Conley, 4 N.Y.3d 742 (2004). The request was again denied upon reconsideration on January 14, 2005. See People v. Conley, 4 N.Y.3d 762 (2005).

On December 9, 2005, Petitioner filed a petition for a writ of habeas corpus. Petitioner claims three (3) instances of ineffective assistance of counsel: 1) failure to remove a juror using a peremptory challenge; 2) failure to timely file a notice of intent to present psychiatric evidence regarding alcohol use and blackouts; and 3) failure to raise an intoxication defense.

IV.    The AEDPA

The Anti Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, governs petitions of incarcerated state court defendants seeking federal habeas corpus relief.

A. Exhaustion

Prior to bringing a petition for habeas corpus relief in federal court, a petitioner "must exhaust the remedies available in state court or demonstrate that 'there is an absence of available State corrective process [or] [that] circumstances exist that render such process ineffective to protect the rights of the [prisoner].'" Fama v. Commissioner of Correctional Services, 235 F.3d 804, 808 (2d Cir. 2000) (citation omitted, insertions in original). The exhaustion requirement mandates that a petitioner fairly present to the highest state court "both the factual and legal premises of the claim he asserts in federal court." Jones v. Keane, 329 F.3d 290, 294-95 (2d Cir. 2003) (internal quotations and citation omitted). A federal habeas corpus petition which contains unexhausted claims should be dismissed, Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), unless there is no longer a state forum available to a petitioner to present his constitutional claim, in which case the federal court shall deem the claim exhausted and deny the claim as if the state court had considered but denied the claim on the basis of a state procedural rule which the petitioner had failed to follow. Coleman v. Thompson, 501 U.S. 727 (1991).

B. Standard of Review

Pursuant to 28 U.S.C. § 2254(d) an application for a writ of habeas corpus that has met the procedural prerequisites

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

8

§ 2254(d). "Adjudication on the merits" requires a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural or other ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001).

Once claims have been adjudicated on the merits, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000); 28 U.S.C. § 2254(d)(1). Alternatively, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Williams, 529 U.S. at 413; 28 U.S.C. § 2254(d)(1). Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Gilchrist v. O'Keefe, 260 F.3d 87, 93 (2d Cir. 2001). Under the AEDPA, determination of the factual issues made by a state court "shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

V. Analysis

    A. Ineffective Assistance of Counsel

In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, a petitioner must prove that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Although the test for ineffective assistance of counsel contains two (2) prongs, district courts need not address both components if a petitioner fails to establish either one. Id. at 697. "In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id.

Before enactment of AEDPA, federal courts reviewed all ineffective assistance claims *de novo*. As noted above, however, AEDPA amended the law to mandate deference to state court decisions that adjudicated a petitioner's claim on the merits. 28 U.S.C. § 2254(d). A state court decision is an "adjudication on the merits" requiring application of the deferential AEDPA standard of review even when it does not explicitly refer to the federal claim or discuss the reasoning for its decision, as long as it finally resolves a party's claim and is based on the substance of the claim advanced, rather than on a procedural ground. Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001). See Eze v. Senkowski, 321 F.3d 110, 121 (2d Cir. 2003) ("[A]n issue may be considered to be adjudicated on its merits even when the state court does not specifically mention the claim but uses general language referable to the merits.") (internal quotation omitted).

Here, the Appellate Division denied Petitioner's ineffective assistance of counsel claims on the merits, finding, "defendant's remaining contentions, including those raised in his supplemental pro se brief, are without merit." People v. Conley, 783 N.Y.S.2d at 85. Thus, because the state court relied on substantive, rather than procedural, grounds to decide

Petitioner's appeal, this holding is an adjudication on the merits and will not be overturned unless it was an "unreasonable application of clearly established Federal law," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

1. Peremptory Challenge

Petitioner claims that his counsel erred by failing to remove a juror, Ms. Olsen ("Olsen"). Olsen was a Suffolk County Probation Officer and Petitioner argues that she was biased and that prejudice can be presumed because of her law enforcement background. Petitioner's counsel moved to strike Olsen for cause but the trial judge denied his application. Tr. 173. Counsel did not use a peremptory challenge to remove Olsen.

A defendant enjoys the right to be tried by "a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). See Ross v. Oklahoma, 487 U.S. 81, 85 (1988). The test for determining whether a juror is biased is "whether the juror[ ] . . . had such fixed opinions that [he] could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035 (1984). Actual bias can be found where a prospective juror admits partiality, or where the same can be inferred from his or her answers to voir dire questions. See United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997). By contrast, bias may be presumed only in "those extreme situations where the relationship between a . . . juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations." Person v. Miller, 854 F.2d 656, 664 (4th Cir. 1988). See Torres, 128 F.3d at 45. "'Doubts about the existence of actual bias should be resolved against permitting the juror to serve, unless the prospective panelist's protestation of a purge of preconception is positive, not

11

pallid.'" United States v. Nelson, 277 F.3d 164, 202 (2d Cir. 2002) (quoting Bailey v. Bd. of County Comm'rs, 956 F.2d 1112, 1127 (11th Cir. 1992)) (quoting United States v. Nell, 526 F.2d 1223, 1230 (5th Cir. 1976)).

The record reflects that Petitioner's counsel was actively engaged in the *voir dire* process. Further, there is nothing in the record to indicate that Olsen was biased against Petitioner and, therefore, there was no prejudice in allowing her to serve on the jury. In fact, the record reflects that Olsen provided sufficient assurances regarding her competence to serve. Olsen indicated that, notwithstanding her occupation, she could serve and be a fair and impartial juror. Jury Voir Dire Transcript, page 89 ("VD Tr."). She maintained that her profession would not hinder her ability to judge the credibility of witnesses. VD Tr. 129-32. Petitioner's counsel then questioned Olsen and she again stated that she could be impartial. She stated that she would judge the evidence fairly and impartially, VD Tr. 152; promised that she would use her "best effort" to be fair and impartial and serve in that capacity, Tr. 153-4; promised that her background would not negatively influence her duties as a juror, VD Tr. 155; and would make every effort to be honest in her decision based upon the facts as she possibly could. VD Tr. 156.[3]

Furthermore, mere membership in a law enforcement agency "is not presumptively a disqualification for service on a jury in a criminal trial." Mikus v. United States, 433 F.2d 719,

---

[3] Olsen also stated that she believes that "intoxication does not excuse a crime from being committed." VD Tr. 154-5. While Petitioner was intoxicated at the time the crime was committed, at the time of the *voir dire*, counsel was not pursuing an intoxication defense. He was pursuing a defense that he later characterized as "who did it" coupled with the contention that the police "rush[ed] to judgement." Tr. 1067. As mentioned below, intoxication was raised before the jury, played a role at the trial, and the jury was charged on the law with regard to intoxication. Nevertheless, since counsel was not pursuing a defense based on intoxication, it was reasonable for him to exercise his discretion not to strike Olsen from the jury based on her comment.

12

724 (2d Cir. 1970) (citations omitted). Given her assurances, it is also immaterial that Olsen worked in the same building where the trial took place. Based on the lack of actual or presumed bias of Olsen, Petitioner has not demonstrated that he was prejudiced by his counsel's failure to strike her. See Torrez v. Sabourin, No. 00 CIV 3286, 2001 WL 401444, at *7 (S.D.N.Y. April 19, 2001). Petitioner has failed to establish ineffective assistance of counsel.

2. Intoxication Defense / Expert Testimony

Petitioner claims that his trial counsel was ineffective because he did not file a timely notice of his intent to present psychiatric evidence regarding alcohol use and blackouts, and this failure led to the trial court precluding this testimony. Petitioner also argues that his counsel did not present the available intoxication defense.

The mere existence of a potential alternative available defense theory is not enough to establish ineffective assistance based on counsel's failure to present that theory. See United States v. Diaz, 176 F.3d 52, 113 (2d Cir. 1999). When analyzing these claims, the resolution of the 'prejudice' inquiry will depend largely on whether the available alternative defense likely would have succeeded at trial (i.e., affected the outcome of the trial). Id. Intoxication is not a complete affirmative defense to a criminal charge, but rather merely reduces the gravity of the offense by negating the specific intent element of the crime charged. People v. Harris, 98 N.Y.2d 452, 474 n. 4 (2002) (citing N.Y. Penal Law § 15.25). It is for the jury to decide if the extent of the intoxication acted to negate the element of intent. People v. Dorst, 598 N.Y.S.2d 800 (App. Div. 2d Dep't. 1993).

Petitioner's intoxication was placed before the jury for their consideration, Tr. 30, 254-55, 932-40, 1067-97, and the jury received a specific instruction regarding intoxication during

13

the court's final instruction. Tr. 1164-1166. Therefore, the intoxication defense was raised before the jury and rejected by the jury. People v. Conley, 783 N.Y.S.2d at 84. As a result, Petitioner's cannot show that the intoxication defense would have succeeded at trial.

New York Criminal Procedure Law Section 250.10 provides that a defendant who intends to present psychiatric evidence must notify the prosecution of this intent within thirty (30) days after the entry of the defendant's plea. If the defendant does not do so, the court may bar the psychiatric evidence. "In the interests of justice and for good cause shown, however, the court may permit such service and filing to be made at any later time prior to the close of the evidence." N.Y.C.P.L. § 250.10.

Petitioner's counsel explained that his purpose in seeking admission of psychiatric evidence was to demonstrate the feasibility of an alcoholic blackout. Tr. 759. Counsel made the determination to seek expert testimony after jury selection based on the prosecutor's attack on the credibility of the blackout testimony. Tr. 761-2. The focus of the proposed testimony was to bolster Petitioner's claims that his memory lapses were used by the police to obtain inaccurate statements implicating him in the crime. Id.

Dr. Richard R. Sternberg's testimony would have done little to support Petitioner's claim that he did not commit the crimes and that his memory lapses were used by the police to obtain inaccurate statements implicating him in the crime. Dr. Sternberg was not going to testify definitively that Petitioner did experience a blackout on the night in question. Dr. Sternberg was only prepared to testify that Petitioner "might" have experienced a blackout on the night the crime was committed. See Forensic Psychological Report of Richard R. Sternberg, Psy.D., March 19, 2001, page 2. Petitioner has failed to show that the outcome of

14

his trial would have been different but for counsel's alleged error. See Davis v. Johnson, 258 F. Supp. 2d 93, 100 (E.D.N.Y. 2003). Therefore, Petitioner has failed to establish ineffective assistance of counsel.

VI. Conclusion

The petition for a writ of habeas corpus is denied and the proceeding is dismissed. Since Petitioner has failed to make a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253. See also Miller-El v. Cockrell, 537 U.S. 322, 336 (2003); Luciadore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d. Cir. 2000); Kellogg v. Strack, 269 F.3d 100, 102 (2d Cir. 2001). Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED

_____
Sandra J. Feuerstein
United State District Judge

Dated: January 10, 2007
Central Islip, New York

Copies to:

Michael J. Miller
Suffolk County District Attorney's Offfice
Criminal Courts Building
200 Center Drive
Riverhead, NY 11901

Christopher Conley
01-A-3303
Otisville Correctional Facility
P.O. Box 8
Otisville, NY 10963